**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 25-1425**

—————

LEGACY SPENCER, as the Administrator for the Estate of Sylvester Demetrius
Selby,

         Plaintiff – Appellant,

     v.

EDWARD GLASER, III, in his individual capacity; SHERIFF DOUG DOUGHTIE,
in his official capacity,

         Defendants – Appellees.

—————

Appeal from the United States District Court for the Eastern District of North Carolina, at
Elizabeth City.  Louise W. Flanagan, District Judge.  (2:23-cv-00065-FL)

—————

Argued:  December 9, 2025                       Decided:  August 4, 2026

—————

Before NIEMEYER, RICHARDSON, and RUSHING, Circuit Judges.

—————

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge
Niemeyer and Judge Richardson joined.

—————

**ARGUED:**  Harry Martina Daniels, Jr., LAW OFFICES OF HARRY M. DANIELS, LLC,
Atlanta, Georgia, for Appellant.  Sonny Sade Haynes, Christopher J. Geis, WOMBLE
BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees.  **ON
BRIEF:**  Chantel Cherry-Lassiter, Elizabeth City, North Carolina, for Appellant.

—————

RUSHING, Circuit Judge:

Sylvester Demetrius Selby was shot during an encounter with two deputies of the Dare County, North Carolina Sheriff's Office. Legacy Spencer, as the administrator of Selby's estate, sued the Dare County Sheriff and the deputy that shot Selby, alleging violations of the Fourth Amendment and North Carolina state law. Relying on body camera footage of the events, the district court dismissed Spencer's complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). We affirm.

## I.

## A.

The parties dispute whether the district court properly considered body camera footage depicting the events giving rise to this suit in resolving the motion to dismiss. We address the parties' arguments on this issue below. For now, we first recount the facts as alleged in the operative complaint. We then briefly describe the portions of the body camera footage most relevant to this appeal.

## 1.

One night in October 2023, Selby was at his family home in Manteo with a man named John Sims. Around 11:30 p.m., Sims "called 911 requesting medical assistance" for Selby, "who was suffering from a stab wound to the heart." J.A. 95. Deputies DuWayne Gibbs and Edward Glaser III responded to the call.

When the deputies arrived at the scene, Deputy Gibbs—who was "closer to the door" of the residence—ordered Selby to come outside. J.A. 95. Selby complied and exited the home. Once Selby was outside, Deputy Gibbs shined his flashlight on Selby and

2

"observed [him] holding a kitchen knife in one hand and an apple in the other hand in a non-threat[en]ing manner." J.A. 96. Deputy Gibbs could also "see blood dripping from . . . Selby's chest." J.A. 96.

Deputy Gibbs ordered Selby "to put the knife down," and Selby responded, "Okay." J.A. 96. But instead of dropping the knife, Selby "proceeded down the steps" of the home's porch. J.A. 96. As Selby descended, Deputy Glaser ordered Selby "to drop the knife." J.A. 96. But again, he failed to do so. *See* Opening Br. 30 (conceding that Selby "fail[ed] to drop [the] kitchen knife"). "While . . . Selby's arms were raised and within seconds of giving the command," Deputy Glaser shot Selby. J.A. 96.

Selby "appear[ed] to stumble over a bicycle located near the steps," after which he fell and landed on his back. J.A. 96. He dropped both the apple and the knife. For about the next "12 seconds," he "frantically flail[ed] his hands and legs in the air while sliding" on the ground. J.A. 97. During this time, Sims "pleaded . . . multiple times" with Deputy Glaser not to shoot Selby again. J.A. 97.

Selby "was able to readjust his body whereby his hands and knees were on the ground." J.A. 97. He then "attempt[ed] to get up and flee." J.A. 97. According to the complaint, Selby "attempted to run in between [Deputy] Gibbs and [Deputy] Glaser in efforts to flee," but he "did not lunge in the direction of" the deputies. J.A. 98. He "was never able to gain his footing." J.A. 98. In response to Selby's attempts to "flee," Deputy Glaser shot Selby two more times. Selby died at the scene.

3

2.

The footage from body cameras worn by the deputies shows a fuller picture. We highlight only three relevant portions here.

First, take Spencer's allegations that, after Selby was initially ordered to put the knife down, he "proceeded down the steps" of the porch and was shot "[w]hile [his] arms were raised," specifically, "raised above his head." J.A. 93, 96. The videos show instead that, after Deputy Gibbs ordered Selby to drop the knife, Selby jumped down the two or three steps and raised his arms slightly above shoulder height only as he braced himself to land at the bottom of the steps, at which point he was close to Deputy Gibbs. In Spencer's own words below, Selby "skip[ped] down the steps toward" the deputies. J.A. 121. He did all this while still clinging to the knife in his hand. After ordering Selby to drop the knife, Deputy Glaser shot Selby as he was coming down the steps.

Next, consider what happened after Selby was shot. The complaint alleges that Selby flailed his limbs and slid on the ground. That much is true. But the complaint omits that Selby refused to stop moving even though Deputy Glaser repeatedly told him to stop and stay where he was. Indeed, it was immediately after Deputy Glaser told Selby to stop moving and to stay down that Selby instead attempted to get up and run.

Finally, take Spencer's allegation that, once Selby got up and "attempt[ed] . . . to flee," he "did not lunge in the direction of" the deputies. J.A. 97–98. Of course, the videos say nothing explicit about Selby's intent. But the body camera footage clearly shows that Selby indeed got up and lunged toward Deputy Glaser. It was only then that Deputy Glaser fired the second and third shots.

4

B.

As the administrator of Selby's estate, Spencer sued Deputy Glaser and the Dare County Sheriff in federal court. Her amended complaint alleged that Deputy Glaser's use of force violated both federal and North Carolina law. In two 42 U.S.C. § 1983 claims against Deputy Glaser, Spencer alleged that the shooting constituted excessive force under the Fourth Amendment. She also asserted a state-law assault and battery claim and a state-law wrongful death claim against both Defendants.

Defendants moved to dismiss the complaint, and the district court granted their motion. *See Spencer v. Glaser*, 776 F. Supp. 3d 336 (E.D.N.C. 2025). Relying heavily on the body camera footage submitted with Defendants' motion to dismiss, *see id.* at 340–343, the district court first concluded that Spencer failed to plausibly allege that Deputy Glaser's use of force was excessive under the Fourth Amendment, *id.* at 343–346. Regarding the first shot, the court found it was objectively reasonable because, at the time of the shot, Selby had defied commands to drop the knife, was "charg[ing] down the steps" of the residence, and was "advanc[ing] toward" Deputy Gibbs. *Id.* at 344–345. On these facts, the court concluded, "[Deputy] Glaser's use of force in firing the first shot was justified." *Id.* at 344. As for the second and third shots, the district court found that they were objectively reasonable given "Selby's initial possession of a knife, defiance of commands, and continuing advances towards" the deputies. *Id.* at 346; *see also id.* (highlighting "Selby's renewed aggressive advance, repeated noncompliance, and potential to seize a weapon"). Based on the body camera footage, the district court also observed, *inter alia*, that the scene was dark, the deputies repeatedly lost their footing due to the

5

"uneven terrain," and that Deputy Gibbs's "options for retreat" were "limit[ed]." *Id.* After concluding that no Fourth Amendment violation occurred, the court also found that even if Deputy Glaser did use excessive force, he was nevertheless entitled to qualified immunity because any Fourth Amendment violation was not clearly established. *Id.* at 346–348.

The district court next determined that the state-law claims against Deputy Glaser in his individual capacity were barred by North Carolina public official immunity because Deputy Glaser did not act with malice. *Id.* at 348. And the claims against the sheriff in his official capacity failed because Deputy Glaser's actions—upon which the claims against the sheriff were premised—were reasonable. *Id.* at 348.

The district court dismissed the complaint, and Spencer timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II.

"We review de novo the district court's decision granting a motion to dismiss." *Doriety ex rel. Est. of Crenshaw v. Sletten*, 109 F.4th 670, 678–679 (4th Cir. 2024). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* at 679 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A plausible complaint contains facts that, as alleged, allow a court to draw the reasonable inference that the defendant is liable." *Id.*

## III.

On appeal, Spencer first argues that the district court improperly considered the deputies' body camera footage in resolving the motion to dismiss. She next contends that

6

the district court erred in dismissing both her Fourth Amendment claims and her state-law claims. We address each issue in turn.

## A.

"Generally, a district court considering a Rule 12(b)(6) motion must accept the 'factual matter' pled in the complaint . . . as true" and draw all reasonable inferences from those facts in the plaintiff's favor. *Bermeo v. Andis*, 163 F.4th 87, 93 (4th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678); *see Doriety*, 109 F.4th at 679. "At this stage, the district court is [generally] 'limited to considering the sufficiency of the allegations set forth in the complaint and the documents attached or incorporated into the complaint.'" *Bermeo*, 163 F.4th at 93 (quoting *Halscott Megaro, P.A. v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023)). Materials "beyond the complaint" and its attachments are ordinarily off limits. *Id.*; *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–166 (4th Cir. 2016).

This rule, however, is not absolute. Relevant here, we have held that "a district court can consider a video submitted at the motion to dismiss stage when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." *Doriety*, 109 F.4th at 679–680 (quoting *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024)). "As the phrase 'blatantly contradicts' implies, '[t]his standard is a very difficult one to satisfy' and requires that the plaintiff's version of events be 'utterly discredited' by the video recording." *Id.* at 679 (quoting *Lewis v. Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024)). If a properly considered video blatantly contradicts a plaintiff's

7

allegations, "then we will dismiss those allegations as implausible." *Wells v. Fuentes*, 126 F.4th 882, 896 (4th Cir. 2025) (internal quotation marks omitted).

Here, Spencer does not argue that the videos are not integral to her complaint. Nor does she challenge the videos' authenticity. Instead, she challenges only whether the portions of the body camera footage considered by the district court "clearly depict[] a set of facts contrary to those alleged in the complaint[] or blatantly contradict[] [her] allegations." *Doriety*, 109 F.4th at 679–680 (internal quotation marks omitted).

As noted above, the district court relied heavily on the deputies' body camera footage in resolving the motion to dismiss. In some places, the district court crossed the line established in *Doriety*.[1] That said, we need not dwell on every aspect of the district court's consideration of the videos to resolve this appeal. Instead, it suffices to focus on two portions of the videos that bear directly on the main question presented for our de novo review: whether Deputy Glaser's use of force was reasonable. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[C]laims that law enforcement officers have used excessive force . . . [are] analyzed under the Fourth Amendment and its 'reasonableness' standard."). These two portions of the videos clearly depict a set of facts "contrary to the allegations and reasonable inferences arising from the . . . complaint." *Doriety*, 109 F.4th at 680.

---

[1] For example, the district court found based on the videos that "the uneven terrain caused [Deputies] Glaser and Gibbs to lose [their] footing and stumble as they attempted to retreat." *Spencer*, 776 F. Supp. 3d at 346. The videos, however, do not "clearly depict[]" that the terrain was uneven, that the deputies stumbled, or that any uneven terrain caused them to stumble. *Doriety*, 109 F.4th at 679.

8

First, Spencer alleged that, after Deputy Gibbs initially told Selby to put the knife down, Selby "proceeded down the steps" and was shot "[w]hile [his] arms were raised" "above his head." J.A. 93, 96. Drawing the reasonable factual inference from these allegations in Spencer's favor, Selby was complying with Deputy Gibbs's order and surrendering. The body camera footage, however, blatantly contradicts such an inference. The videos show that, instead of dropping the knife, Selby leaped down the stairs with the knife still in his hand, landing in close proximity to Deputy Gibbs. As Spencer herself stated below, Selby "skip[ped] down the steps toward" the deputies. J.A. 121. The videos also clearly show that he raised his arms slightly above shoulder level only as he was landing on the ground—appearing to brace for impact, not to surrender. Because the videos blatantly contradict the factual inference from the complaint—i.e., that Selby was complying with Deputy Gibbs's order and calmly surrendering—we may consider this portion of the videos. *See Doriety*, 109 F.4th at 679–680.

Second, Spencer alleged that, before the second and third shots, Selby "attempt[ed] to get up and flee" and "did not lunge in the direction of" the deputies. J.A. 97–98. The videos do not blatantly contradict the allegation that Selby intended to flee. But they do clearly show that, in his attempt to get up, Selby lunged "in the direction of," at the very least, Deputy Glaser. J.A. 98. In other words, the videos clearly show that Spencer's allegation that Selby "did not lunge *in the direction of*" the deputies is false. J.A. 98 (emphasis added). Therefore, we may consider this fact from the videos. *See Doriety*, 109 F.4th at 679.

9

With the facts now settled, we turn to analyzing whether the complaint, as amended by the videos in these two respects, raises a "reasonable inference that the [D]efendant[s] [are] liable." *Id.*

B.

We start with Spencer's Section 1983 claims alleging that Deputy Glaser used excessive force in violation of the Fourth Amendment. "Section 1983 'creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States.'" *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)). "When, as here, a law enforcement officer is sued in his individual capacity, he is 'entitled to invoke qualified immunity, which is immunity from suit itself.'" *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022) (ellipsis omitted) (quoting *Cooper*, 735 F.3d at 158). Qualified immunity "gives 'government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Rambert v. City of Greenville*, 107 F.4th 388, 398 (4th Cir. 2024) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)).

In determining whether an officer is entitled to qualified immunity, "we conduct a two-pronged analysis." *Id.* "First, we analyze whether the plaintiff has [plausibly alleged] that 'a constitutional violation occurred.'" *Id.* (quoting *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)). "Second, we consider whether the right at issue was 'clearly established' at the time of the events in question." *Id.* A plaintiff must satisfy both prongs to prevail, *Robles v. Prince George's Cnty.*, 302 F.3d 262, 268 (4th Cir. 2002), and

10

we may address the two prongs in either order, *Hensley*, 876 F.3d at 580.  Here, we start and end with whether Spencer plausibly alleged that Deputy Glaser violated the Fourth Amendment.  We conclude that she did not.

"The use of deadly force is a seizure subject to . . . the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  "The 'touchstone of the Fourth Amendment is "reasonableness,"'" as measured in objective terms." *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  We have held that it is reasonable for a police officer to use deadly force "when [the] police officer 'has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others.'" *Knibbs*, 30 F.4th at 214 (quoting *Cooper*, 735 F.3d at 159).  "To determine whether such probable cause existed . . . , we ask whether [Deputy Glaser's] use of deadly force was 'objectively reasonable in light of the facts and circumstances confronting [him], . . . without regard for [Deputy Glaser's] underlying intent or motivation.'" *Hensley*, 876 F.3d at 582 (quoting *Graham*, 490 U.S. at 397).  In other words, we must "consider whether the hypothetical reasonable officer in [Deputy Glaser's] situation would have had" probable cause to believe that Selby posed a threat of serious physical harm to himself or others. *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).

We judge Deputy Glaser's actions from "'the perspective of a reasonable officer on the scene,'" *Barnes*, 145 S. Ct. at 1358 (quoting *Graham*, 490 U.S. at 396), and consider "the 'totality of the circumstances,'" he confronted, *id.* (quoting *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017)).  The inquiry into the reasonableness of an officer's actions "has no time limit." *Id.*  "Of course, the situation at the precise time of the shooting

11

will often be what matters most; it is, after all, the officer's choice in that moment that is under review." *Id.* "But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.*

Like the district court, the parties divide Deputy Glaser's use of force into two parts: (1) the first shot, and (2) the second and third shots. *See Spencer*, 776 F. Supp. 3d at 344–346. We do the same. We also note that Spencer does not challenge the district court's holding that she failed to plausibly allege that the first shot violated the Fourth Amendment. She has therefore forfeited that issue. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Nevertheless, because the circumstances leading to the first shot "bear on how a reasonable officer would have understood and responded to" the circumstances leading to the second and third shots, we discuss the first shot before turning to the second and third. *Barnes*, 145 S. Ct. at 1358.

A reasonable officer in Deputy Glaser's situation would have had "probable cause to believe that [Selby] pose[d] a threat of serious physical harm" to both Deputy Gibbs and Deputy Glaser at the time of the first shot. *Knibbs*, 30 F.4th at 214 (internal quotation marks omitted). To begin, when Selby exited the residence, there was "blood dripping from [his] chest." J.A. 96. A reasonable officer could have viewed Selby's injury as suggesting "he may have recently engaged in conflict." *Spencer*, 776 F. Supp. 3d at 345. More importantly, Deputy Gibbs ordered Selby to put the knife down, but he failed to comply. Instead, he jumped down the steps with the knife still in his hand, moving in the direction of the deputies and landing near Deputy Gibbs. As explained above, the videos

12

reveal no hint of compliance or surrender, notwithstanding the fact that Selby raised his arms slightly upon landing at the bottom of the steps.

We have held that "[i]f an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Hensley*, 876 F.3d at 585. We have also held that a reasonable officer could "view[] [a] noncompliant and charging suspect as an imminent threat." *Rambert*, 107 F.4th at 399. The complaint's allegations and the relevant portions of the body camera footage show that Selby was noncompliant, had a knife, and—at least from the deputies' view—would have been seen as charging the deputies. Deputy Glaser was justified in using deadly force under these circumstances. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (finding that officer had probable cause to use deadly force against a suspect in part because the suspect did not respond to the officer's commands and instead advanced on the officer with a knife).

The same conclusion follows for Deputy Glaser's second and third shots. As just explained, seconds before the second and third shots, it was reasonable to conclude that Selby charged the deputies with a knife and posed an imminent threat of harm to them. That fact "bear[s] on how a reasonable officer would have understood and responded to" Selby's subsequent actions. *Barnes*, 145 S. Ct. at 1358. And it does so in a way that favors Deputy Glaser. In addition, the videos show that at the time the second and third shots

13

were fired, Selby was aggressively lunging in Deputy Glaser's direction.[2]  As we held in *Rambert*, when a shot suspect rises "to a standing position and move[s] toward" an officer, it is reasonable for an officer to think "the threat posed by [the suspect] ha[s] not passed." 107 F.4th at 399.  Indeed, "a reasonable officer could [think] that his shots . . . did not abate the threat posed." *Id.*  Such is the case here, so Deputy Glaser was again justified in using deadly force.[3]

---

[2] Spencer notes that Selby lunged at a slight angle toward Deputy Glaser, not directly at his center of mass.  But Spencer provides no authority for the proposition that this makes any constitutional difference.  Selby had charged the deputies moments before. An officer in Deputy Glaser's situation could reasonably conclude that Selby was doing so again.

[3] "Although [Spencer] did not allege in her complaint" that Deputy Glaser repeatedly ordered Selby not to move and to stay down before firing the second and third shots, "the video makes plain that he did." *Doriety*, 109 F.4th at 675 n.3.  Our decision in *Doriety* had no occasion to address whether courts may consider portions of a video that clearly depict facts that supplement, rather than contradict, a plaintiff's allegations or fill in the gaps left by a plaintiff's complaint.  A footnote in *Doriety* suggests that courts may do so.  *See id.* at 675 & n.3 (asserting that the officer "activated [his] vehicle's emergency lights" even though that fact was not alleged in the complaint, and then explaining that "[a]lthough the plaintiff did not allege in her complaint that Officer Sletten had activated his vehicle's emergency lights, *the video makes plain that he did*, and the plaintiff in her brief concedes that Sletten executed a traffic stop on the stolen car" (emphasis added)).  A footnote in a subsequent decision suggests that they may not.  *See Harrold v. Hagen*, 174 F.4th 393, 405 n.13 (4th Cir. 2026) (summarily stating, based on *Doriety*, that "relevant" facts shown in a video "which are not alleged in the Complaint . . . are left for discovery").  We need not opine on that issue here because Spencer does not argue that any alleged lack of warnings from the deputies made Deputy Glaser's use of force unreasonable.  *See Grayson O*, 856 F.3d at 316 ("A party waives an argument by failing to present it in [her] opening brief . . . .").  And in the circumstances presented here, whether Deputy Glaser warned Selby before the second and third shots does not change our conclusion about the plausibility of Spencer's excessive force claim.

Spencer highlights several additional allegations, but they do not change the constitutional analysis. She first emphasizes, in line with the allegations in her complaint, that Selby was unarmed when Deputy Glaser fired the second and third shots. But the fact that Selby was unarmed does not mean that Deputy Glaser lacked probable cause to believe that Selby posed an imminent threat to the deputies' safety. As an initial matter, it is by now axiomatic that "an officer need not see [a] weapon in the suspect's hands to find him objectively dangerous." *Stanton*, 25 F.4th at 234–235; *accord Caraway v. City of Pineville*, 111 F.4th 369, 382–383 (4th Cir. 2024). And even if Deputy Glaser could see that Selby had dropped the kitchen knife, a reasonable officer would not have known "whether [Selby] was or was not armed" with another weapon when Selby charged, "at which point [Deputy Glaser] had mere seconds to judge the risk and determine how to respond to [Selby's] aggressive and non-compliant approach." *Rambert*, 107 F.4th at 400. Again, Selby had already charged the deputies with a knife, and after being shot, he stood up and again lunged toward Deputy Glaser. "For all [Deputy Glaser] knew," Selby could have had another weapon. *Id.* Or he "could have been rapidly and aggressively approaching [Deputy Glaser] trying to take" Deputy Glaser's gun. *Id.* At bottom, even if Deputy Glaser "did not see a [weapon] in [Selby's] hands" before firing the second and third shots, "he could not confirm that [Selby] was unarmed." *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). "We will not second-guess the split-second judgment of a trained police officer . . . , particularly where inaction could have resulted in death or serious injury to the officer and others." *Id.* at 1007–1008.

15

Next, Spencer argues that Selby was not trying to harm the deputies; instead, he was only "attempting to escape." Opening Br. 30. But even accepting that allegation as true, no facts alleged in the complaint or shown in the videos raise a plausible inference that a reasonable officer in Deputy Glaser's position would have interpreted Selby's actions that way. *See Melgar*, 593 F.3d at 355 ("Reasonableness is evaluated from the officer's perspective, in recognition of the fact that officers cannot be expected to respond to information they did not possess at the time they acted." (citation omitted)). Contrary to the allegations in the complaint, the body camera footage shows that Selby attempted to stand up and lunged in Deputy Glaser's direction. Given the split-second nature of Deputy Glaser's decision to shoot and Selby's previous knife-wielding advance, it was reasonable to conclude that Selby intended to attack.

Lastly, Spencer suggests that because Selby had already been shot once by the time Deputy Glaser fired the second and third shots, Deputy Glaser should have known that Selby was not a threat. But Spencer disregards the fact that Selby managed to get up and lunge toward Deputy Glaser despite having already been shot. Again, as we stated in *Rambert*, a reasonable officer could have thought "that his shots . . . did not abate the threat [Selby] posed." 107 F.4th at 399.

In sum, even accepting the factual allegations and reasonable inferences from the complaint except as blatantly contradicted by the body camera footage, Spencer has failed to plausibly allege that Deputy Glaser's use of force violated the Fourth Amendment. We therefore affirm the dismissal of Spencer's Fourth Amendment claims.

16

C.

Spencer's North Carolina assault and battery and wrongful death claims, which she asserted against both Defendants, also fail to state a claim for the reasons we have already discussed.

We begin with the claims as they were alleged against Deputy Glaser in his individual capacity. North Carolina has "'codif[ied] and clarif[ied] those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability.'" *Knibbs*, 30 F.4th at 227 (quoting *State v. Irick*, 231 S.E.2d 833, 846 (N.C. 1977)). The relevant statute provides that an officer may use "deadly physical force . . . when it is or appears to be reasonably necessary . . . [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force." N.C. Gen. Stat. § 15A-401(d)(2)(a); *see Turner v. City of Greenville*, 677 S.E.2d 480, 483–484 (N.C. Ct. App. 2009). "[E]ven if a police officer acting under the color of state law violates North Carolina's use of deadly force statute, that officer may still be entitled to public official immunity." *Knibbs*, 30 F.4th at 227. Under that doctrine, "'a public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt.'" *Id.* (quoting *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012)).

Spencer's challenge to the district court's dismissal of her state-law claims is limited. She argues only that because she "stated a claim [on] which relief could be granted as to whether Deputy Glaser violated [the] Fourth Amendment[,] . . . she has *a fortiori* done so with respect to her state tort claims." Opening Br. 31; *see also id.* at 31–33 (failing to

17

meaningfully differentiate between her federal and state claims).  We have concluded, however, that Spencer failed to allege plausible Fourth Amendment claims.  Because Spencer has hinged the success of her state-law claims on that of her Fourth Amendment claims, and the latter fail for the reasons discussed above, we conclude that Spencer's state-law claims against Deputy Glaser in his individual capacity fail as well.  We therefore affirm the district court's dismissal of those claims.

Spencer also asserted both state-law claims against the Dare County Sheriff in his official capacity.  As alleged, the claims are premised on "the intentional acts of [Deputy] Glaser," which Spencer alleged "are imputed to [the sheriff] in his [o]fficial [c]apacity." J.A. 109; *see also* J.A. 111.  That is, Spencer alleged these claims "under the respondeat superior doctrine." *Turner*, 677 S.E.2d at 484.  But as just discussed, we have concluded that Deputy Glaser's actions did not run afoul of North Carolina law.  From that conclusion it follows that the sheriff cannot be held liable for those actions either. *See id.*; *Sigman*, 161 F.3d at 789.  We therefore affirm the dismissal of the state-law claims asserted against the sheriff in his official capacity.

## IV.

For the foregoing reasons, the district court did not err in dismissing Spencer's complaint.  The district court's judgment is therefore

*AFFIRMED.*

18